UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JALIA SIMMONS,

             Plaintiff,

     v.

CAROLYN W. COLVIN,

             Defendant.

Case No.  13-cv-02821-MEJ

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 19

## INTRODUCTION

Plaintiff Jalia Simmons ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying Plaintiff's claim for disability benefits.  Pending before the Court are the parties' cross-motions for summary judgment.  Dkt. Nos. 18, 23.  Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument.  Having carefully reviewed the parties' papers, the administrative record ("AR") in this case, and relevant legal authority, the Court hereby DENIES Plaintiff's Motion and GRANTS Defendant's cross-motion for summary judgment for the reasons set forth below.

## BACKGROUND

Plaintiff is a 31-year-old woman that graduated high school and has completed some undergraduate work at schools in the Bay Area.  AR 40-42.  She has worked as a daycare assistant, restaurant host, nonprofit canvasser, exam proctor, and as a sales associate at Macy's.  AR 43, 177.  Plaintiff claims disability due to a number of impairments, including depression, lower back pain, and arthritis pain in her ankles.  AR 26, 303.

As to Plaintiff's back pain, the record reflects that she fell on her tailbone in 2002 and fell down a flight of stairs in 2003.  AR 29, 299.  However, she states that the main reason for her low back pain is due to a car accident in 2005, at which time she sustained disk bulges in the lumbar

1    spine.  AR 295.  Plaintiff states that she has had chronic back pain since the accident and has been

2    doing poorly ever since.  AR 295.  The record reflects that Plaintiff had a fibroid condition that

3    caused back pain as well.  AR 295, 299.

4          As to her ankle, Plaintiff has given a variety of reasons for the pain, including an injury

5    during a basketball game when she was 12 (AR 452), another basketball-related injury in 2000

6    (AR 389), and an injury from playing soccer in 2003 (AR 303-04).

7          On November 5, 2009, Lasha Pierce, M.D., completed a physical exam for low back pain.

8    AR 292.  Dr. Pierce noted that Plaintiff's lumbar spine MRI from August 2009 showed L4-L5

9    degenerative disk disease with a lumbar disk herniation, showing mild canal stenosis.  AR 292.

10   Dr. Pierce diagnosed Plaintiff with degenerative disk disease and a small prolapsed disk, but found

11   no orthopedic surgical intervention was needed and that treatment could be provided by her

12   primary care physician.  AR 292.  Dr. Pierce prescribed Tylenol and discharged Plaintiff that day.

13   AR 292.

14         Plaintiff underwent at least two sets of x-rays for her right ankle at Highland Hospital in

15   Oakland in 2010.  On January 26, 2010, Dr. Sara Khademi reviewed Plaintiff's right ankle x-ray

16   from that same day.  AR 412.  Dr. Khademi noted moderate soft tissue swelling, but no evidence

17   of acute fracture or alignment abnormality.  AR 412.  She found mild to moderate degenerative

18   changes of the ankle mortise with joint space narrowing and subchondral sclerosis.  AR 412.  On

19   August 19, 2010, Dr. Chung Lee reviewed Plaintiff's right ankle x-ray from that same day.  AR

20   412.  Dr. Lee noted there was no evidence of acute fracture or dislocation.  AR 412.  He found

21   degenerative arthritis with osteophytes, as well as joint space narrowing and sclerosis.  AR 412.

22   Dr. Farhad Sani reviewed the same x-rays on September 22, 2010.  AR 412.  Dr. Sani noted

23   degenerative changes in the tibiotalar joint and at least one 1 cm osteochondral defect off the

24   anterolateral talar dome.  AR 412.

25         On February 28, 2010, Todd Nguyen, D.O., completed a comprehensive orthopedic

26   evaluation.  AR 303-07.  Dr. Nguyen observed a "minimally reduced" range of motion in the

27   lumbar spine and a normal range of motion in the right ankle.  AR 306.  He reported normal

28
                                             2

United States District Court
Northern District of California

strength, symmetric reflexes, intact sensation, and negative straight leg raising.  AR 305-06.  Dr. Nguyen assessed that Plaintiff retained the residual functional capacity to walk, stand, and sit up to 6 hours; lift 50 pounds frequently and 100 pounds occasionally; and frequently bend, stoop, kneel, and crawl.  AR 306.

In a Progress Record from Highland Hospital, dated March 24, 2010, the examiner also noted that Plaintiff's left ankle x-ray showed degenerative arthritis with moderate changes.  AR 339-40.

Beverly Morgan, M.D. reviewed Plaintiff's file on March 30, 2010, and completed a Physical Residual Functional Capacity Assessment.  AR 313-18.  Dr. Morgan assessed that Plaintiff retained the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently; and stand, sit, and walk for 6 hours in an 8-hour workday.  AR 314.  She found that Plaintiff had no other limitations.  AR 314-16.

On August 25, 2010, Plaintiff's mother, Gloria Burkhalter, completed a Third Party Function Report.  AR 241-48.  Ms. Burkhalter stated that Plaintiff was unable to walk long distances, lift heavy boxes, climb lots of stairs, play sports, or dance.  AR 242.  She wrote that Plaintiff needed assistance with dressing and did not prepare her own meals because she was unable to stand for long periods.  AR 242-43.  According to her mother, Plaintiff waters the plants occasionally, goes outside about four or five times a week, walks short distances, drives a car, and shops for food and clothes about twice a month.  AR 243-44.  Ms. Burkhalter stated that Plaintiff goes out to dinner and visits relatives, attends art classes three times a week, and attends church on a regular basis.  AR 245.  She also stated that Plaintiff uses crutches, wheelchair, cane, brace/splint, back braces, and an ankle brace every day.  AR 247.

As part of a Progress Record completed by podiatrists Dr. Dutra and Dr. Splitter on November 3, 2010, Plaintiff stated that an ankle injection she received in June was 85% effective and that, although her ankle pain was improving, it continued to give her pain.  AR 30, 492.  Dr. Dutra and Dr. Splitter recommended that Plaintiff consider surgery in the future, but in the meantime, she should wear a brace and elevate her foot at the end of the day.  AR 491-92.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   The record shows that Plaintiff was in another car accident on December 23, 2010, in

2   which she rear-ended a motorist.  AR 484.  At Highland Hospital Dr. Bradley Frazee evaluated

3   and diagnosed Plaintiff with cervical and lumbar strain, but discharged her with painkillers and no

4   driving restrictions.  AR 485.

5   Plaintiff sprained her left ankle twice at the beginning of 2011, in January and February.

6   475-76. At an exam on February 16, she reported that her right ankle gave her minimal

7   discomfort.  AR 471.

8   Plaintiff underwent an MRI of her right ankle on March 5, 2011.  AR 468-69.  Dr. Lee

9   reviewed the MRI and compared it with a prior right ankle radiograph dated December 15, 2010.

10  Dr. Lee noted that there appeared to be degenerative arthritis in the anterolateral aspect of the right

11  ankle joint, with a 6 mm osteochondral defect in the lateral aspect of the talar dome without

12  displacement.  AR 468.

13  Plaintiff returned to Highland Hospital on June 9, 2011, for increased ankle pain and

14  swelling.  AR 457-59.  Dr. Amy Splitter administered a steroid injection into her ankle joint and

15  instructed Plaintiff to ice and ibuprofen as needed.  AR 459.  Plaintiff returned on July 14, and the

16  notes from that exam indicate that the injection did not relieve her pain.  AR 452.  Plaintiff stated

17  that she would like to pursue surgery options.  AR 452.  Dr. Splitter assessed osteochondritis

18  dissecans and discussed surgical options with Plaintiff, including ankle arthroscopy.  AR 453.  She

19  initiated physical therapy and referred Plaintiff to Orthopedics for a second opinion.  AR 453.

20  On June 20, 2011, Dr. Lee completed a Radiology Interpretation of Plaintiff's right ankle

21  based on x-rays taken that day.  Dr. Lee noted mild degenerative arthritis in the anterolateral

22  aspect of the right ankle joint, with no evidence of acute fracture or dislocation.  AR 455.  He

23  noted that the ankle mortise appeared preserved.  AR 455.

24  Bhrett Lash, M.D., completed a "Medical Assessment of Ability to do Work Related

25  Activities" on October 13, 2011.  AR 590-92.  Dr. Lash opined that Plaintiff retained the residual

26  functional capacity to occasionally lift 10 pounds, stand and/or walk for 4 hours out of an 8-hour

27  workday with 20-minute breaks for 1 hour at a time, and sit for 4 hours in an 8-hour workday with

28

4

20-minute breaks without interruption for 45 minutes.  AR 590-91.  Dr. Lash based his opinion on right ankle pain secondary to osteochandral defects and lower lumbar "degenerative disc," both supported by MRI findings.  AR 591.

David Tran, DPM, examined Plaintiff on November 21, 2011.  AR 612.  Dr. Tran reviewed Plaintiff's x-rays from June and noted degenerative joint changes in her right ankle.  AR 612.  Plaintiff informed Dr. Tran that she wanted to pursue surgery for her ankle, and Dr. Tran recommended that Plaintiff follow up with Dr. Splitter to discuss surgery options.  AR 612.  He prescribed ibuprofen for pain.  AR 612.

Plaintiff saw Dr. Splitter again on January 4, 2012.  AR 610.  Dr. Splitter determined that Plaintiff was ready for surgery on her ankle and scheduled a follow-up for a discussion regarding surgery options.  AR 610.  Plaintiff returned to Highland Hospital on February 13, 2012, complaining of pain in her right ankle.  AR 606-07.  She described the pain as sharp, stabbing, and burning.  AR 606.  The clinical impression noted "severe arthritis in her right ankle with midfoot exostosis, confirmed from radiograph."  AR 607.  Plaintiff consented to right ankle arthroscopy, possible mini arthrotomy, with midfoot exostectomy.  AR 607.

Plaintiff underwent the following surgical procedure on February 23, 2012:

1. Arthroscopic debridement and microfracture of the lesion.
2. Exostectomy of right mid foot bone spur.
3. Arthrotomy, right ankle joint with debridement of osteochondral lesion.

AR 615-17.  Plaintiff's surgeon, Denten Eldredge, DPM, noted that Plaintiff tolerated the procedure well and directed her to remain non-weight bearing for the next two weeks and to follow up with the Podiatry Clinic in one week.  AR 616-17.

**SOCIAL SECURITY ADMINISTRATION PROCEEDINGS**

On November 25, 2009, Plaintiff filed a claim for Supplemental Security Income Benefits, alleging disability beginning on November 15, 2006.  AR 143.  On April 14, 2010, the Social Security Administration ("SSA") denied Plaintiff's claim, finding that she did not qualify for disability benefits.  AR 78.  Plaintiff subsequently filed a request for reconsideration, which SSA

5

United States District Court
Northern District of California

1   denied on December 10, 2010.  AR 87.  On January 10, 2011, Plaintiff requested a hearing before

2   an Administrative Law Judge ("ALJ").  AR 92.  ALJ Timothy G. Stueve conducted a hearing on

3   December 6, 2011.  AR 35-75.  Plaintiff appeared at the hearing with her attorney, Richard

4   Gutstadt, and her mother, Gloria Burkhalter, who testified as a witness on her behalf.  AR 37, 64-

5   8.  The ALJ also heard testimony from Vocational Expert Alan Nelson.  AR 37.

6   **A.    Plaintiff's Testimony**

7          1.    <u>Examination by the ALJ</u>

8          At the hearing, Plaintiff testified that she is able to read and write, and that she has

9   attended undergraduate courses at the Art Institute of San Francisco, Berkeley City College, and

10  Laney College.  AR 41-42.  She was not working at the time of the hearing, although she

11  volunteered as an activist, mostly writing letters and making phone calls.  AR 43.  She last worked

12  in 2006, when she was a sales associate at Macy's for about eight to ten months.  AR 43.  She

13  testified that she stopped working there because she had some complications with a coworker and

14  was taking frequent breaks that she was not supposed to take.[1]  AR 43.

15         Plaintiff testified that the pain in her lower back felt like "a heated, burning, stinging,

16  stabbing sensation."  AR 44-45.  She said she also has soreness in her muscles and shooting nerve

17  pain that goes down her spine, through the hip, and down her leg.  AR 45.  Standing, sitting, or

18  walking too long make the pain "really bad."  AR 45.  Plaintiff took Baclofen, Gabapentin,

19  Flexeril, Naproxen, Vicodin, and Motrin for the pain.  AR 45.  She also has a medical cannabis

20  card.  AR 46.  She found marijuana helps her at school because she does not have to take the other

21  medicine, which causes her to "feel real doped up," making it difficult to focus and learn.  AR 46.

22  Although not prescribed by a doctor, Plaintiff was using a cane for about six months because she

23  felt it was necessary.  AR 45-46.

24         As to her ankles, Plaintiff testified that she first injured her right ankle at 13, when she

25  shattered it, causing a piece of bone to disconnect from the main ankle joint.  AR 46, 48.  Plaintiff

26  _____

27  [1] Plaintiff's earnings at Macy's were less than half what was required for substantial gainful
    employment; thus the ALJ did not consider this work relevant for his analysis.  AR 43-44.

28                                                      6

said she had the option of surgery or doing stretches, but was told surgery was not guaranteed to make the ankle better, so she chose stretching alone. AR 47. She testified that walking and exercise made her ankle pain worse, and that driving is also difficult. AR 47. Plaintiff also said that she had sprained her left ankle six times in the past year because she had been over-compensating for the lack of mobility in her right. AR 48.

Plaintiff also testified that she suffered from depression, but she was not currently taking any medication and had not recently seen a psychiatrist or psychologist. AR 44, 48. The ALJ noted that Plaintiff had a history of psychiatric in-patient care, including seven visits between 1999 and 2008. AR 54. Plaintiff testified that she had not had any psychiatric hospitalizations since 2010. AR 54. She stated that she had been misdiagnosed sometime before 2010 and had her fallopian tubes removed, after which she went into a deep state of depression. AR 55.

The ALJ also questioned Plaintiff about her limitations. She testified that she could walk about 15 minutes or three blocks, and sit and stand 15 minutes each. AR 50. She also testified that she had difficulty lifting and had numbness and shooting pains in her arms and hands. AR 51. Plaintiff stated that she was able to dress herself, but she sometimes needed help with her pants because she could not bend over. AR 53.

When questioned about activities outside the home, Plaintiff stated that she sometimes attended church services, and she drove with her mom to see her grandmother every Sunday. AR 51. Plaintiff and her mom also take road trips, including their most recent trip to a casino, where she used a scooter to get around. AR 52. Although she has a driver's license, Plaintiff stated that she had not driven in a few months because of her ankle. AR 53. Plaintiff took the bus to San Francisco and Foothills Square, where she played bingo. AR 53. She also had chiropractic appointments once or twice a month and "[had] been seeing an acupuncturist." AR 52.

Plaintiff testified that her hobbies include gardening, listening to music, and playing the piano. AR 53. She stated that she had not looked for work, but she was always open to "finding something where I can . . . be able to function and still work and not have to worry about . . . getting yelled at for sitting down too much." AR 57. However, she also stated that her activism

7

1    was "more like work for me," such as writing for an hour.  AR 57-58.  She had also talked to

2    people about doing some type of in-home business.  AR 58.

3              2.        Examination by Richard Gutstadt

4              After the ALJ's questions, Plaintiff's attorney examined her.  She testified that she had

5    three injections for her right ankle – the first was good for a few days, the second for two weeks,

6    and the third was unsuccessful because her joints were inflamed and the technician was unable to

7    inject in the correct area.  AR 58.  She also stated that in November 2010, one of her doctors

8    advised her to elevate the ankle whenever possible, although she had already been doing it on a

9    regular basis for about 4-5 years, elevating it every day for about 3-4 hours for about 30-45

10   minutes at a time.  AR 58-60.

11             When questioned about surgery, Plaintiff responded that her doctor wanted to rebuild the

12   ankle joint with donated cartilage and bone.  AR 60.  She stated that the procedure involved

13   clearing out the bone shards and shaving down a piece of bone that had started growing out the top

14   of her foot.  AR 60.  Pre-op for surgery was scheduled for January 2012, with the surgery

15   potentially in February.  AR 60.  The recovery period would be eight months to a year.  AR 60.

16             Plaintiff also testified regarding her sciatica.  She said it occurs every day, acting up more

17   in the morning, as well as when she walks, stands, or sits too long.  AR 60.  Lying down helped to

18   relieve the sciatica.  AR 60.

19             As to her educational pursuits, Plaintiff stated that she had to stop attending the Art

20   Institute because she took several medical leaves for her back and gastrointestinal problems,

21   including an ulcer.  AR 61.  She transferred to community college to have more schedule

22   flexibility.  AR 62.  She continued to miss classes – in a four-month semester, she estimates that

23   she missed three weeks of school.  AR 62.

24             Mr. Gustadt also questioned Plaintiff regarding the medications she took and whether they

25   had any side effects.  AR 63.  Plaintiff testified that she suffered from migraines, back pain,

26   constipation, and diarrhea.  AR 63.

27

28                                                          8

**B.**     **Gloria Burkhalter's Testimony**

After Plaintiff completed her testimony, Mr. Gustadt examined her mother, Ms. Burkhalter, who testified that Plaintiff lived with her. AR 64. She opined that Plaintiff had limitations that might make it difficult for her to perform full-time job. AR 64. She stated that she had to help Plaintiff go up and down stairs, go to and from the bathroom, and help her dress. AR 65. Ms. Gustadt also testified that Plaintiff could only sit for short periods and had difficulty walking. AR 66, 67. Although she had observed Plaintiff's difficulties for over five years, she felt that they intensified over the last couple of years. AR 65. Ms. Gustadt believed that Plaintiff "absolutely" could not work full-time. AR 68.

**C.**     **Vocational Expert's Testimony**

At the hearing, the ALJ posed the following hypothetical to the vocational expert:

> Assume an individual who's able to lift 10 pounds occasionally, with standing and walking limited to four hours in an eight-hour day . . ., with 20-minute breaks and then without interruption being able to stand or walk for one hour. And then the sitting the same limitation. Four hours with 20 minute breaks and without interruption 45 minutes at a time. And then the only other limitation that's listed on the form is an inability to walk well secondary to the foot pain but without any description of how limited that is other than what I already described with the standing or walking of four hours with the 20 minute break.

AR 70. Based upon this hypothetical, the vocational expert testified that sedentary, unskilled work would be unfeasible because Plaintiff would not be able to perform the long-term sitting required. AR 71-72.

The ALJ next included in the hypothetical "an individual who can do the full range of sedentary work but needs to elevate the leg, the right leg, at the end of the day." AR 72. The vocational expert testified that there are sedentary positions available if she could "accommodate her leg pain after the job is over." AR 72. However, if the elevation of the leg had to occur during the workday, the vocational expert indicated that it would not be feasible if the elevations took place longer than one 15-minute break in the morning, one 15-minute break in the afternoon, and a 30-60 minute lunch break. AR 72.

**D.      The ALJ's Findings**

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[2]  20 C.F.R. § 404.1520(a).  The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled."  *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).  During the first four steps of this sequential inquiry, the claimant bears the burden of proof to demonstrate disability.  *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work."  *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(i) and 404.1520(b).  Here, the ALJ determined that Plaintiff had not performed substantial gainful activity since November 25, 2009.  AR 26.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act.  If no severe impairment is found, the claimant is not disabled.  20 C.F.R. § 404.1520(c).  Here, the ALJ determined that Plaintiff had the following severe impairments: chronic low back pain; obesity; and bilateral ankle arthritis.  AR 26.  The ALJ determined that the following impairments were not severe: asthma, bipolar-I disorder, depression, and posttraumatic stress disorder.  AR 26.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404,

---

[2] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d) (1)(A).

United States District Court
Northern District of California

1    Subpart. P, Appendix. 1.  20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment either meets

2    the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is

3    conclusively presumed to be disabled, without considering age, education and work experience.

4    20 C.F.R. § 404.1520(d).  Here, the ALJ determined that Plaintiff does not have an impairment or

5    combination of impairments that meet or equals the listings.  AR 28.

6         Before proceeding to step four, the ALJ must determine the claimant's Residual Function

7    Capacity ("RFC").  20 C.F.R. § 404.1520(e).  RFC refers to what an individual can do in a work

8    setting, despite mental or physical limitations caused by impairments or related symptoms.  20

9    C.F.R. § 404.1545.  In assessing an individual's RFC, the ALJ must consider all of the claimant's

10   medically determinable impairments, including the medically determinable impairments that are

11   non-severe.  20 C.F.R. § 404.1545(a)(1)-(2).  Here, the ALJ determined that Plaintiff has the RFC

12   to perform the full range of sedentary work as defined in 20 C.F.R. § 416.967(a).[3]

13        The fourth step of the evaluation process requires that the ALJ determine whether the

14   claimant's RFC is sufficient to perform past relevant work.  20 C.F.R. § 404.1520(f).  Past

15   relevant work is work performed within the past 15 years that was substantial gainful activity, and

16   that lasted long enough for the claimant to learn to do it.  20 C.F.R. § 404.1560(b)(1).  If the

17   claimant has the RFC to do his past relevant work, the claimant is not disabled.  20 C.F.R. §

18   404.1520(a)(4) (iv).  Here, the ALJ determined that Plaintiff has no past relevant work.  AR 33.

19        In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there

20   are other jobs existing in significant numbers in the national economy which the claimant can

21   perform consistent with the claimant's RFC, age, education, and work experience.  20 C.F.R. §

22   404.1520(g); 20 C.F.R. § 404.1560(c).  The Commissioner can meet this burden by relying on the

23   testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20

---

[3] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or
carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as
one that involves sitting, a certain amount of walking and standing is often necessary in carrying
out job duties.  Jobs are sedentary if walking and standing are required occasionally and other
sedentary criteria are met."  20 C.F.R. § 416.967(a).

United States District Court
Northern District of California

C.F.R. pt. 404, subpt. P, app. 2. *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006). Here, based on the testimony of the vocational expert, Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff can perform the full range of sedentary work and is therefore not disabled. AR 34. In reaching this conclusion, the ALJ found that Plaintiff's account of her symptoms and limitations was not fully credible. AR 32-34.

**E.     ALJ's Decision and Plaintiff's Appeal**

       On January 9, 2012, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled. AR 24-34. This decision became final when the Appeals Council declined to review it on April 4, 2013. AR 5-10. Having exhausted her administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). On January 13, 2014, Plaintiff filed her Motion for Summary Judgment. Dkt. No. 18. On February 12, 2014, the Commissioner filed a Cross-Motion for Summary Judgment. Dkt. No. 23. Plaintiff filed her Reply on February 26, 2014. Dkt. No. 25.

**STANDARD OF REVIEW**

       This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted). "Substantial evidence" means more than a scintilla, but less than a preponderance, of evidence that a reasonable person might accept as adequate to support a conclusion. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). However, where the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's decision. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ. *Id.*

       Additionally, the harmless error rule applies where substantial evidence otherwise supports

United States District Court
Northern District of California

12

1    the ALJ's decision.  *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990).  An error is harmless

2    if the evidence that was not considered is neither significant nor probative.  *Vincent v. Heckler*,

3    739 F.2d 1393, 1394-95 (9th Cir. 1984).

**DISCUSSION**

4

5    Plaintiff raises one argument in her Motion – the ALJ failed to articulate legally sufficient

6    reasons for rejecting Dr. Lash's opinion.  Pl.'s Mot. at 3.  Plaintiff maintains that the ALJ should

7    have given controlling weight to Dr. Lash because he was her treating physician.  *Id.*  In response,

8    Defendant argues that Plaintiff fails to establish that Dr. Lash was her treating physician.  Def.'s

9    Mot. at 4.  In the alternative, Defendant argues that, even assuming Dr. Lash was Plaintiff's

10   treating physician, she still fails to demonstrate any error in the ALJ's decision.  *Id.* at 5.

11   **A.     Whether Dr. Lash is Plaintiff's Treating Physician**

12   When determining whether a claimant is disabled, the ALJ must consider each medical

13   opinion in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b);

14   *Zamora v. Astrue*, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  In deciding how much

15   weight to give to any medical opinion, the ALJ considers the extent to which the medical source

16   presents relevant evidence to support the opinion.  20 C.F.R. § 416.927(c).  Generally, more

17   weight will be given to an opinion that is supported by medical signs and laboratory findings, and

18   the degree to which the opinion provides supporting explanations and is consistent with the record

19   as a whole.  *Id.*

20   In conjunction with the relevant regulations, the Ninth Circuit has developed standards that

21   guide the analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528

22   F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).  Courts "distinguish among the

23   opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2)

24   those who examine but do not treat the claimant (examining physicians); and (3) those who neither

25   examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830

26   (9th Cir. 1995).  "By rule, the Social Security Administration favors the opinion of a treating

27   physician over non-treating physicians."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing

28

United States District Court
Northern District of California

20 C.F.R. § 404.1527).  If a claimant has a treatment relationship with a provider, and that provider's opinion is supported by clinical evidence and not inconsistent with the record, the provider will be given controlling weight.  20 C.F.R. § 416.927(c)(2).  "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'"  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

Here, Plaintiff concedes that Dr. Lash's treatment notes are not available in the record. Pl.'s Mot. at 6.  However, she maintains that Dr. Lash is her treating physician because he examined her twice, in September and October 2011, and a nurse practitioner in his office examined her "several times."  *Id.* at 5-6.  Plaintiff cites to *Ghokassian v. Shalala*, 41 F.3d 1300, 1303 (9th Cir. 1994), in support of her argument.  *Id.* at 6.  In *Ghokassian*, the court found that the physician was the claimant's treating physician because he saw the claimant twice within a 14-month period, prescribed medication, and referred to the claimant as "my patient."  *Ghokassian*, 14 F.3d at 1303.  The court also noted that the claimant saw no other doctors during that period and specifically requested the physician treat him.  *Id.*

Here, Plaintiff saw Dr. Lash twice in a two-month period, but she never exclusively saw him.  In a June 2010 disability report, Plaintiff states that she received medical treatment from Highland Hospital, and that her regular physician was Dr. Tamaroon.  AR 201.  She specifically stated that Dr. Tamaroon at Highland Hospital treated "all" of her "physical conditions" by examining her and prescribing her medications.  AR 201.  As for Dr. Lash, although she identified his clinic—the Native American Health Clinic ("NAHC")—as an additional medical provider, she stated that she had only gone to the clinic once for a "second opinion."  AR 202.  Although she continued going to the clinic, the only documentation of her treatment at NAHC is a one-page questionnaire in which Dr. Lash states that he examined Plaintiff twice (in September and October 2011), but there is no indication that Plaintiff requested he treat her or that he prescribed any medication.  AR 660.

The Court also notes that the vast majority of medical records in this case are from

14

1    Highland Hospital, while the only records from NAHC are the Medical Assessment form

2    completed by Dr. Lash and the one-page questionnaire in which Dr. Lash states that he examined

3    Plaintiff twice, but provides no information regarding those examinations. *Compare* AR 336-90,

4    428-50, 581-82 (Highland Hospital records) *with* AR 590-92 (NAHC records). While her

5    treatment at Highland Hospital included various x-rays, CT scans, and MRI studies of her right

6    ankle in 2010 and 2011, as well as examinations and treatment by two in-house podiatrists, Dr.

7    Dutra and Dr. Splitter (AR 30, 491-92), no such records are provided for any treatment she might

8    have received from Dr. Lash. *See, e.g., Orn*, 495 F.3d at 633 (weight afforded to treating

9    physician's opinion depends on "the nature and extent of the physicians' relationships" with the

10   claimant); *Khougaz v. Apfel*, 2000 WL 274187, at *5 (N.D. Cal. Feb. 29, 2000). Based on this

11   record, it is not clear whether Dr. Lash was Plaintiff's treating physician. Regardless, as discussed

12   below, the ALJ's decision regarding Dr. Lash is supported by the record.

**B.     The ALJ Did Not Err in Assigning Dr. Lash's Opinion Some Weight**

14          The ALJ assigned Dr. Lash's opinion "some weight," but noted "the record does not

15   contain evidence of any examinations, office records, other medical evidence, or any other

16   supporting documentation Dr. Lash used when rendering his opinion." AR 31-32. Even assuming

17   that Dr. Lash was Plaintiff's treating physician, the Court finds the ALJ's decision is supported by

18   substantial evidence and free of legal error.

19          "If a treating physician's opinion is 'well-supported by medically acceptable clinical and

20   laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

21   case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631 (quoting 20 C.F.R. §

22   404.1527(d)(2)). "If a treating physician's opinion is not given 'controlling weight' because it is

23   not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the

24   [Social Security] Administration considers specified factors in determining the weight it will be

25   given." *Id.* "Those factors include the '[l]ength of the treatment relationship and the frequency of

26   examination' by the treating physician; and the 'nature and extent of the treatment relationship'

27   between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

28

United States District Court
Northern District of California

15

1        "Additional factors relevant to evaluating any medical opinion, not limited to the opinion

2   of the treating physician, include the amount of relevant evidence that supports the opinion and the

3   quality of the explanation provided; the consistency of the medical opinion with the record as a

4   whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the

5   degree of understanding a physician has of the [Social Security] Administration's 'disability

6   programs and their evidentiary requirements' and the degree of his or her familiarity with other

7   information in the case record." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)).  Nonetheless, even if

8   the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference.

9   *See id.* at 632 (citing SSR 96–02p[4] at 4).  Indeed, "[i]n many cases, a treating source's medical

10  opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the

11  test for controlling weight."  SSR 96–02p at 4.

12        In his October 13, 2011 Medical Assessment of Ability to do Work Related Activities, Dr.

13  Lash opined that Plaintiff retained the residual functional capacity to occasionally lift 10 pounds,

14  stand and/or walk for 4 hours out of an 8-hour workday with 20 minute breaks and without

15  interruption for 1 hour at a time; and sit for 4 hours in an 8-hour workday with 20-minute breaks

16  without interruption for 45 minutes.  AR 590-91.  Dr. Lash based his opinion on right ankle pain

17  secondary to osteochandral defects, and lower lumbar "degenerative disc," both supported by MRI

18  findings.  AR 591.

19        Plaintiff concedes that there are no treatment notes from Dr. Lash in the record.  Pl.'s Mot.

20  at 6.  An ALJ must evaluate a physician's explanations for his opinion, and the weight given to an

21  opinion depends on the strength of such explanations.  20 C.F.R. § 404.1527(c)(3) ("The better an

22  explanation a source provides for an opinion, the more weight we will give that opinion.").  Here,

23  since there are no treatment notes and little to no explanation provided for Dr. Lash's opinion, this

24  fact alone seems sufficient reason for the ALJ not to afford his opinion controlling weight.

25  _____

26  [4] "SSRs do not carry the force of law, but they are binding on ALJs nonetheless."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); 20 C.F.R. § 402.35(b)(1).  The Ninth
27  Circuit defers to the rulings unless they are "plainly erroneous or inconsistent with the Act or regulations."  *Chavez v. Dept. of Health and Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996).

28

1    *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating doctor's opinion properly rejected

2    when treatment notes "provide no basis for the functional restrictions he opined should be

3    imposed on [claimant]"); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)

4    (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("an ALJ need not accept a

5    treating physician's opinion that is conclusory and brief and unsupported by clinical findings");

6    *Orn*, 495 F.3d at 631 (a treating physician's opinion will be afforded great weight when it is "well-

7    supported by medically acceptable clinical and laboratory diagnostic techniques").

8         Despite this, Plaintiff argues the record contains several test results that support Dr. Lash's

9    opinion.  Pl.'s Mot. at 6.  Plaintiff points to the following evidence: (1) X-Rays of the right ankle

10   in 2010 showing mild to moderate degenerative changes of the right ankle with joint narrowing

11   (AR 412); (2) an MRI of the right ankle from March 2011 showing a 6 mm osteochondral defect

12   in the lateral aspect of the talar dome, and degenerative arthritis in the anterolateral aspect of the

13   ankle joint (AR 468-69); (3) a February 2012 X-Ray of the right ankle showing "severe end-stage

14   arthritis" with midfoot exostosis (AR 607); (4) a doctor's report of an X-Ray of the left ankle in

15   March 2010, indicating moderate degenerative changes (AR 338-40); and (5) an MRI of the

16   lumbar spine from August 2009, showing L4-L5 degenerative disk disease with a lumbar disk

17   herniation, showing mild canal stenosis (AR 292).  Pl.'s Mot. at 6-7.

18        Even if it were to find these results support Dr. Lash's opinion, the Court finds it must still

19   uphold the ALJ's decision.  "'If a treating or examining doctor's opinion is contradicted by

20   another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons

21   that are supported by substantial evidence."  *Ryan*, 528 F.3d at 1198 (quoting *Bayliss v. Barnhart*,

22   427 F.3d 1211, 1216 (9th Cir. 2005)).  Here, the ALJ supported his decision with substantial

23   evidence, including Dr. Nguyen's orthopedic evaluation, in which he noted that Plaintiff exhibited

24   a normal range of motion in the right ankle and that she would be expected to walk, stand, and sit

25   up to six hours.  AR 30, 306.  Dr. Nguyen observed a "minimally reduced" range of motion in the

26   lumbar spine and a normal range of motion in the right ankle.  AR 306.  He reported normal

27   strength, symmetric reflexes, intact sensation, and negative straight leg raising.  AR 305-06.  He

28   

United States District Court
Northern District of California

17

1    assessed that Plaintiff retained the residual functional capacity to walk, stand, and sit up to 6

2    hours; lift 50 pounds frequently and 100 pounds occasionally; and frequently bend, stoop, kneel,

3    and crawl.  AR 306.

4            The ALJ also cites to Dr. Morgan's RFC Assessment.  AR 31, 313-16.  Dr. Morgan

5    assessed that Plaintiff retained the residual functional capacity to lift and carry 50 pounds

6    occasionally and 25 pounds frequently; stand, sit, and walk for 6 hours in an 8-hour workday.  AR

7    314.  She found that Plaintiff had no other limitations.  AR 314-16.

8            The ALJ considered Dr. Dutra and Dr. Splitter's recommendation from November 2010

9    that Plaintiff consider surgery in the future, but in the meantime wear a brace and elevate her foot

10   at the end of the day.  AR 30, 491.

11           The ALJ also considered the medical records from Highland Hospital.  In February 2011,

12   Plaintiff reported that her ankle gave her minimal discomfort.  AR 30, 471.  In July 2011, Plaintiff

13   reported that she was currently experiencing "0/10" pain.  AR 30, 448.  The ALJ also noted that

14   multiple X-rays, CT scans, and MRI studies of Plaintiff's right ankle in 2010 and 2011 showed

15   only mild to moderate degenerative changes.  AR 30, 412, 468.

16           The Court finds that this constitutes substantial evidence that supports the ALJ's decision

17   to give Dr. Lash's opinion some weight.  Further, where the evidence is susceptible to more than

18   one rational interpretation, the Court must uphold the ALJ's decision.  *Magallanes*, 881 F.2d at

19   750.  Determinations of credibility, resolution of conflicts in medical testimony, and all other

20   ambiguities are to be resolved by the ALJ.  *Id.*; *see also Batson v. Comm'r of Soc. Sec. Admin.*,

21   359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999))

22   ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may

23   not substitute our judgment for that of the ALJ.")

24           Plaintiff also contends that Dr. Lash's findings are controlling because he is the only

25   doctor that considered her right ankle MRI results from March 2011.  Pl.'s Mot. at 6-7 (citing 468-

26   69).  In his assessment, Dr. Lash opines that Plaintiff's ability to stand and walk are affected by

27   her right ankle impairment, finding right ankle pain "secondary to osteochondral defects,

28                                                          18

United States District Court
Northern District of California

supported by MRI findings." AR 590.  Plaintiff argues that Dr. Lash is the only doctor that

provided an assessment that could have observed the March 2011 MRI, and "therefore, he

apparently did review the MRI based on the notes he left on his assessment." Pl.'s Mot. at 6-7

(citing AR 590).  However, there are no treatment notes or other testimony from Dr. Lash

confirming Plaintiff's speculation.  Further, while the March 2011 MRI indicates "degenerative

arthritis in the anterolateral aspect of the ankle joint," the report also provides that the subtalar

joint and tendinous structures appear normal, and that the medial and lateral ankle ligaments

appear intact.  AR 468-69.  It is not clear that this MRI supports a finding of complete disability.

Regardless, as discussed above, the ALJ determined that the medical evidence in the record

contradicts such a finding, and he provided specific and legitimate reasons that are supported by

substantial evidence to support this decision.  The Court cannot reverse the ALJ's decision where

the evidence is susceptible to more than one rational interpretation.  *Magallanes*, 881 F.2d at 750.

Finally, Plaintiff directs the Court's attention to an X-Ray of the right ankle that appears to

be from Highland Hospital on February 13, 2012, one month after the ALJ issued his decision.

AR 607.  The X-Ray showed "severe end-stage arthritis" with midfoot exostosis.  AR 607.

During that visit, Plaintiff described the pain in her ankle as sharp, stabbing, and burning.  AR

606.  Plaintiff submitted this evidence to the Appeals Council, which considered it in ruling on

Plaintiff's appeal.  AR 8.

The Ninth Circuit has held "that when a claimant submits evidence for the first time to the

Appeals Council, which considers that "when the Appeals Council considers new evidence in

deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative

record, which the district court must consider when reviewing the Commissioner's final decision

for substantial evidence." *Brewes v. Comm'r of Soc. Sec.*, 682 F.3d 1157, 1163 (9th Cir. 2012)

(citing *Tackett*, 180 F.3d at 1097-98).  The SSA regulations require the Appeals Council to

evaluate the new evidence "if it relates to the period on or before the date of the administrative law

judge hearing decision."  20 C.F.R. § 404.970(b).

Here, the Court finds that the February 2012 X-ray relates to the relevant period because it

United States District Court
Northern District of California

19

1    permits a comparison of the changes to Plaintiff's ankle.  *See Martinez v. Astrue*, 2014 WL

2    310387, at *19 (N.D. Cal. Jan. 28, 2014) (X-rays and MRIs taken "just days and weeks after the

3    ALJ rendered his decision . . . relates to the period before the ALJ's decision because it permits

4    a comparison of the changes to Plaintiff's spine that occurred after the 2007 MRIs were

5    taken."); *Oliver v. Astrue*, 2013 WL 211131, at *23-25 (N.D. Cal. Jan. 16, 2013) (evidence

6    submitted to the Appeals Council related to the time before the ALJ's decision because Asperger's

7    Disorder is "a developmental disorder, not a condition which suddenly appeared after hearing.").

8    However, the Court is not convinced that the X-ray renders the ALJ's decision unsupported by

9    substantial evidence.  The X-ray does not show on its own that Plaintiff's ankle precludes her from

10    performing suitable work or was so severe as to be disabling, nor has Plaintiff presented any

11    medical opinion subsequent to the X-ray opining as much.  Even if the Court were to find the X-

12    ray supports Dr. Lash's opinion, the relevant inquiry at this stage is not whether there is some

13    evidence to support Plaintiff's position, but whether there was substantial evidence to support the

14    finding made by the ALJ.  The only post-surgery records are: (1) a note in the Operative Report

15    from Plaintiff's surgeon stating that she tolerated the procedure well, directing her to remain non-

16    weight bearing for the next two weeks, and to follow up with the Podiatry Clinic in one week (AR

17    616-17); and (2) a Progress Report from Highland Hospital, dated March 1, 2012, stating that

18    Plaintiff was "doing well" and recommending ankle exercises three times a day (AR 603).   Thus,

19    because the record contains substantial evidence to support the ALJ's decision, the Court must

20    defer to his findings.  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985) (The court cannot

21    substitute its own determination of what the evidence shows if there is sufficient evidence to

22    support the ALJ's determination.).

23    ///

24    ///

25    ///

26    ///

27    ///

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

For the reasons stated above, the Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Cross-Motion for Summary Judgment.  Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: March 17, 2014

_____
MARIA-ELENA JAMES
United States Magistrate Judge

21